UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEYTON BURGOS,  )  <br> ) <br> Petitioner,  ) <br> ) <br> v.  ) <br> ) <br> GARY RODEN,  ) <br> ) <br> Respondent.  ) | Civil No. 13-30202-LTS |

MEMORANDUM AND ORDER ON MOTION TO DISMISS
<u>PETITION FOR HABEAS CORPUS (DOC. NO. 23)</u>

November 20, 2015

SOROKIN, J.

Petitioner Leyton Burgos, a prisoner at the Massachusetts Correctional Institution in

Norfolk, Massachusetts, has filed a counseled petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, in which he raises five challenges to his conviction and sentence.  Doc. No. 1.

The respondent has moved to dismiss the petition for failure to state a claim meriting relief.

Doc. No. 23.  For the reasons that follow, the respondent's motion is ALLOWED and the

petition is DISMISSED, as each of Burgos's claims is either meritless or procedurally defaulted.

I.      <u>BACKGROUND</u>

On September 23, 1996, following a jury trial in Hampden County Superior Court,

Burgos was convicted of being an accessory before the fact to first-degree murder.

<u>Commonwealth v. Burgos</u>, 965 N.E.2d 854, 859 (Mass. 2012).  He received a life sentence.

Doc. No. 1 at 2;[1] S.A. at 162.[2]  The charges against Burgos stemmed from a gang-related

shooting that occurred in Springfield, Massachusetts, in May 1994.  Burgos, 965 N.E.2d at 859.

Burgos was a member of Los Solidos, one of three Latin street gangs operating in Springfield at

the time.  Id.  His position within the gang was that of "enforcer," making him responsible for

enforcing rules and ensuring "missions" – efforts to "exact violence against rival gang members

as a means of dealing with various disputes" – were completed as planned.  Id.  During the

relevant time period, Los Solidos was "at war" with a rival gang, La Familia, due to disputes

about territories in which members of the gangs sold drugs.  Id.  On May 28, 1994, as part of this

"war," two members of Los Solidos carried out a drive-by shooting in which the "godmother" of

La Familia, Sylvia Ramirez, was fatally wounded.  Id. at 859-61.

Burgos was accused of planning the shooting during a May 27, 1994 meeting with

Miguel Moure, the president of the local chapter of Los Solidos, as well as other lower-ranking

gang members.  Id. at 859-60.  The meeting took place in a State Street apartment that was a

frequent Los Solidos hangout, and portions of the meeting were described by various witnesses

at trial, including other gang members and occupants of the apartment.  Id.  Testimony of those

witnesses suggested that Burgos aspired to earn a promotion within the gang by organizing

missions to kill five people, and that the shooting of Ramirez was his first effort to achieve that

goal.  Id.  With Moure's blessing, Burgos orchestrated the shooting by suggesting the target and

location for the mission, then directing Erasmos Santos Vega (a Los Solidos "soldier") to steal a

---

[1] Citations to documents available on the Court's electronic docket will reference the docket number assigned to the document on that system, and the page number appearing in the ECF header at the top of the document.
[2] The respondent has filed a Supplemental Answer (cited herein as "S.A.") containing the state-court record in five bound volumes.  See Doc. No. 40.

car to be used for the shooting.  Id.  He also selected and cleaned a firearm kept in the apartment for use in such missions.  Id.

The next day, two other Los Solidos "soldiers" – Wilfredo Rosado and Jose Carrasquillo – met with a "warlord" who discussed the mission with them and provided the gun that Burgos had cleaned the previous day.  Id. at 860.  Burgos then joined the men, confirmed that Rosado and Carrasquillo knew what to do, and accompanied them to the car that Vega had stolen and parked nearby.  Id.  Rosado drove the car and Carrasquillo sat in the front passenger seat with the gun.  Id.  Burgos got in the back seat, but asked to be let out of the car shortly after they set out toward the location of the mission, stating he needed to return to the area near the State Street apartment.  Id.  Rosado and Carrasquillo continued on and completed the mission, with Carrasquillo shooting from the front passenger-side window as Rosado drove the car past a group of La Familia members at the designated location.  Id.  Ramirez was struck and later died. Id. at 860-61.

On June 20, 1994, police officers came to the State Street apartment looking for a juvenile runaway.  Id. at 861.  When they arrived, Burgos was present and was holding the gun that had been used in the shooting.  Id.  Upon seeing police through the peephole of the apartment's front door, Burgos tossed the gun beneath a couch before the police were permitted to enter.  Id.  The officers found and detained the runaway, searched the apartment with the permission of its primary tenant, seized three firearms (including the one used in the Ramirez shooting), and arrested one gang member (who had been sitting on the couch under which the firearm was found).  Id.  A few weeks later, before any charges had been filed against him related to the Ramirez shooting, Burgos moved to Puerto Rico to stay with his mother.  Id.  He

was arrested there a year later when a warrant related to this case was discovered after he had applied for a private security job. Id.; S.A. at Tab 8, p.26.

At trial, the Commonwealth offered testimony from a number of witnesses, including Vega and Rosado, both of whom testified pursuant to cooperation agreements negotiated by their respective attorneys. Burgos, 965 N.E.2d at 862; S.A. at Tab 6, p.177. Vega was the only witness to testify that Burgos sought a promotion within the gang and directed Vega to steal a car for the mission. S.A. at Tab 6, pp.184-88. Rosado was the only witness to testify that Burgos was present immediately before the mission, including briefly in the car on the way to the mission. Id. at pp.243-46. And Vega and Rosado were the only two witnesses to testify that Burgos suggested the location for the mission. Id. at pp.187, 239. Both men denied having any specific, negotiated deals in place with prosecutors at the time of their testimony, although both agreed they had been promised, and expected, "consideration" for their "cooperation." Id. at pp.177, 198, 229, 257, 259.

Defense counsel offered testimony from another Los Solidos member, Ricardo Negron. Negron testified he was present at the State Street apartment on May 27 and 28, 1994, and that he witnessed no meeting involving Moure and Burgos, nor any other gang-related business that would distinguish those dates from any others. Id. at Tab 7, pp.172-74. However, on direct examination Negron described overhearing a conversation several days earlier in which two other gang members told Burgos someone had directed them that Ramirez should be killed. Id. at pp.174-76. He also testified on cross examination that he was shot outside the State Street apartment building on May 28, 1994, the same night as the Ramirez shooting, and he speculated that gang members risked death by testifying against other gang members. Id. at pp.187, 193.

Over defense counsel's objection, the trial court included a "consciousness of guilt" charge in the final jury instructions, based on evidence that Burgos had moved to Puerto Rico sometime after police confiscated the murder weapon in his presence. See id. at Tab 7, pp.70-83; id. at Tab 8, pp.134-35. Although the parties litigated the legal question of whether such an instruction was warranted, defense counsel did not challenge the content of the instruction at the time it was given. See id. at Tab 8, pp.149-50. Specifically, defense counsel did not object when the trial court charged the jury as follows: "You heard evidence suggesting that the defendant may have fled from Massachusetts *after he discovered he was about to be charged with the offense for which he is now on trial.*" Id. at p.134 (emphasis added).

Burgos's timely direct appeal of his conviction and sentence was stayed by the Supreme Judicial Court ("SJC") in 1998 at his request, pending preparation and filing of a motion for a new trial. Burgos, 965 N.E.2d at 862; S.A. at 187. That motion was filed *ten years* later. Burgos, 965 N.E.2d at 862; S.A. at 6. After hearing oral argument on Burgos's claims, which included counsel ineffectiveness and prosecutorial misconduct, as well as challenges to the admission of testimony by Rosado and Vega and to the cooperation agreements with those witnesses, the trial court denied Burgos's motion. See generally S.A. at 162-75. The SJC affirmed Burgos's conviction and sentence and the denial of his motion for a new trial in an April 17, 2012 decision. See generally Burgos, 965 N.E.2d 854. In addition to the claims considered and rejected by the trial court, the SJC also rejected Burgos's direct appeal claim of trial court error related to the jury charge on consciousness of guilt. Id. at 867-69.

The SJC denied rehearing in June 2012, and the United States Supreme Court denied certiorari in December 2012. S.A. at 190. Burgos filed a timely, counseled federal habeas

petition in this Court on November 26, 2013 raising five claims, only three of which he has

elected to pursue in his merits briefing:[3]

> 1)   The prosecutor either knowingly elicited, or failed to correct, materially false
>       testimony by Rosado and Vega regarding their cooperation agreements;
>
> 2)   Defense counsel was ineffective in presenting Negron as a trial witness, in failing
>       to object to improper cross-examination of Negron, and in failing to object to the
>       trial judge's misstatement of facts in the jury charge on consciousness of guilt;
>       and
>
> 3)   The trial court misstated the evidence in its charge to the jury on consciousness of
>       guilt.

Doc. No. 45; see also Doc. Nos. 1, 2.  The merits of Burgos's claims have been fully briefed and

are ripe for disposition.[4]

II.   DISCUSSION

        As set forth in detail in the sections that follow, Burgos is not entitled to federal habeas

relief.  Two of his claims are meritless, and the third is procedurally defaulted.

---

[3] In May 2014, Burgos sought discovery and an evidentiary hearing on a potential Brady claim
related to his interpretation of facts surrounding the Commonwealth's decision not to investigate
or charge the Los Solidos "warlord" who explained the mission to Rosado and Carrasquillo on
the day it occurred and supplied Carrasquillo with the gun used in the shooting.  See Doc. No.
28.  The state trial court denied a similar request made while Burgos's motion for a new trial was
pending there.  S.A. at 7; id. at Tab 10, pp.3-6.  This Court held oral argument on the motion,
then denied it.  Doc. No. 39.  Presumably as a result of that ruling, Burgos has abandoned his
Brady claim in his subsequent merits briefing.  Compare Doc. No. 2 at 9 (alleging as Ground 5
failure to disclose exculpatory information about the failure to investigate, interview, and/or
prosecute the "warlord"), with Doc. No. 45 (containing no reference to Ground 5).
        In addition, Burgos originally stated, but later withdrew, a claim of prosecutorial
misconduct in opening statement, trial presentation, and closing argument.  Compare Doc. No. 2
at 11 (including such a claim as Ground 4), with Doc. No. 45 at 1 (withdrawing Ground 4).
        Insofar as the three remaining claims are concerned, Burgos has narrowed his
prosecutorial misconduct and counsel ineffectiveness claims in his merits briefing.  The Court
will consider only those claims, and only those bases for such claims, as are included in Burgos's
merits brief.
[4] Burgos's request for oral argument (Doc. No. 48 at 3-4) is DENIED.  In light of the extensive
submissions by both parties, Doc. Nos. 1-5, 2, 23, 45, 46, 48, the Court does not find further
argument would be necessary or helpful.

A.     Meritless Claims

1.     *Legal Standard*

Federal district courts may not grant a writ of habeas corpus unless they find that the state court's adjudication of the petitioner's claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  In other words, state court decisions merit substantial deference.  As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011); see Burt v. Titlow, 134 S. Ct. 10, 15-16 (2013) (emphasizing the "formidable barrier" faced by federal habeas petitioner where claims already were adjudicated in state court, and limiting relief to cases of "extreme malfunctions" by state criminal justice systems).

If a state court's decision "was reasonable, it cannot be disturbed" on habeas review. Hardy v. Cross, 132 S. Ct. 490, 495 (2011) (per curiam); see Parker v. Matthews, 132 S. Ct. 2148, 2149 (2012) (per curiam) (admonishing federal habeas courts not to "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)).  When applying this strict standard, federal courts must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003); accord Teti v. Bender, 507 F.3d 50, 57 (1st Cir. 2007).

7

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002); cf. Richter, 562 U.S. at 100 (stating "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference).

For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court.  Williams, 529 U.S. at 404-05; see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  In a string of recent decisions summarily reversing grants of habeas relief by lower federal courts, the Supreme Court has "repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of § 2254(d)(1).  Glebe v. Frost, 135 S. Ct. 429, 431 (2014); see also, e.g., Lopez v. Smith, 135 S. Ct. 1, 4 (2014) (warning against using circuit precedent to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced" (internal quotation and citation omitted)).

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule, but "unreasonably applies it to the facts of the particular state prisoner's case."  Williams, 529 U.S. at 407-08.  When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state

court's application of clearly established federal law was objectively unreasonable." Id. at 409.

An unreasonable application of the correct rule can include the unreasonable extension of that

rule to a new context where it should not apply, as well as an unreasonable failure to extend the

rule to a new context where it should apply.  Id. at 407.  It cannot, however, include a decision

by a state court not "to apply a specific legal rule that has not been squarely established by [the

Supreme Court]."  Knowles, 556 U.S. at 122.  "The more general the rule, the more leeway

courts have in reaching outcomes in case-by-case determinations."  Yarborough v. Alvarado, 541

U.S. 652, 664 (2004).

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement

to relief.  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303

F.3d 24, 36-37 (1st Cir. 2002) (en banc).  Rather, relief is available only where a state court's

"determination was unreasonable – a substantially higher threshold."  Schriro v. Landrigan, 550

U.S. 465, 473 (2007); accord Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011); see also Cavazos

v. Smith, 132 S. Ct. 2, 4 (2011) (per curiam) (emphasizing that a habeas court "may not overturn

a state court decision . . . simply because the federal court disagrees with [it]"); Richter, 562 U.S.

at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in

justification that there was an error well understood and comprehended in existing law beyond

any possibility for fairminded disagreement").

> ## 2.   *Allegedly False Testimony by Rosado and Vega*

Burgos devotes more than half of his brief – nearly thirty pages – to his claim that his

Due Process rights were violated when the prosecutor knowingly elicited or failed to correct

false testimony by Rosado and Vega about the terms of their cooperation agreements.  See Doc.

No. 45 at 2-29.  He urges the Court to find that the prosecutor's actions were so egregious, and

the state courts' treatment of this issue so deficient, that the claim is subject to de novo review here, even under the stringent standards of § 2254(d). The record, however, does not permit the Court to accept Burgos's invitation, nor does it support his view of the facts underlying this claim.

The facts relevant to this claim are these. Vega described the terms of his cooperation agreement as follows: "Just tell, they'll take it into consideration." S.A. at Tab 6, p.177. He also testified that his mother had been given $500 in order to move her out of the Springfield area based on safety concerns. Id. at p.178. In addition, he testified he was serving a sentence on an unrelated case, and that he was not receiving any benefit or assistance with respect to that sentence as a result of his testimony against Burgos. Id. at pp.178-79. On cross-examination, Vega reiterated that he was "[h]oping" for "some consideration from the District Attorney's office," but denied having received any written promises or terms from the prosecutor, and further denied that his attorney had negotiated "terms of cooperation" or any "kind of deal." Id. at p.198.

When asked what he understood "relative to [his] cooperation in this case," Rosado similarly testified that his cooperation would "[j]ust be taken into consideration," but went on to say, "[f]or all I know I'm doing life." Id. at p.229. On cross-examination, Rosado denied that his lawyer had "worked out a deal with the DA's office" on his behalf, id. at p.257, but agreed that he was "hoping for some consideration" from the prosecutor and, specifically, hoped that his testimony would "reduce[ his] sentence," id. at p.259.

Burgos claims that both cooperators' testimony in this regard was false, as they each knew their attorneys had negotiated "cooperation for consideration" deals with the prosecutor, and that the prosecutor was therefore obligated to correct the testimony when given at trial. Doc.

No. 45 at 3-6.  According to Burgos, Rosado personally attended a meeting between his lawyer and the prosecutor during which he was reassured about the existence of a "cooperation for consideration" deal – a fact which Burgos claims was not disclosed to defense counsel or the jury.  Id. at 4; S.A. at 371-72.  Additionally, Burgos claims Vega was permitted to serve a substantial portion of his unrelated sentence in a county jail, rather than a state house of corrections, at the prosecutor's request due to his cooperation against Burgos, rendering false Vega's claim that he was "on [his] own" for purposes of that sentence.  Doc. No. 45 at 6; see S.A. at 909.

       The SJC considered and rejected Burgos's due process claim on its merits.[5]  According to the SJC, the claim failed because the prosecutor: informed Burgos's counsel before trial of the nature and existence of the relevant cooperation agreements; referenced such agreements in his opening statement to the jury at trial; and elicited testimony about the agreements from both Rosado and Vega on direct examination.  Burgos, 965 N.E.2d at 864.  The SJC concluded that "[a]ny equivocation by Rosado or Vega concerning the terms of his cooperation agreement appeared to reflect the witness's uncertainty regarding the exact contours of the consideration he would receive."  Id. at 864.  The SJC agreed with the trial judge that the challenged testimony was not misleading, as it was made "reasonably clear to the jury that the witnesses were not suggesting they did not have cooperation agreements, but rather indicating that under the terms of those agreements, the amount of 'consideration' . . . was not yet defined."  Id. at 863.

_____

[5] In state court, Burgos characterized this issue as alleging a failure by the prosecutor to fully disclose the terms of the relevant cooperation agreements, and also as the knowing presentation by the prosecutor of false testimony at trial.  See S.A. at 226-28.  This, perhaps, explains why the SJC's discussion centers on the law related to a prosecutor's disclosure obligations.  Here, the focus of Burgos's briefing is on the latter argument, and any question concerning disclosure to defense counsel of the relevant facts is not pressed as an independent constitutional violation.  See generally Doc. No. 45 at 2-29.

The SJC's determination was neither contrary to, nor an unreasonable application of, clearly established federal law.  The relevant "clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), for purposes of such a claim includes United States v. Bagley, 473 U.S. 667 (1985), Giglio v. United States, 405 U.S. 150 (1972), and Napue v. Illinois, 360 U.S. 264 (1959).[6]  Read together, these cases establish that knowing use of false testimony amounts to a due process violation and warrants a new trial only where such testimony was "material," i.e., where "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Giglio, 405 U.S. at 154.  This materiality standard is the same as the standard for prejudice applicable to counsel ineffectiveness claims under Strickland v. Washington, 466 U.S. 668 (1984).  See Bagley, 473 U.S. at 678-82 (finding Strickland standard requiring "reasonable probability that . . . the result of the proceeding would have been different," or "probability sufficient to undermine confidence in the outcome," was "sufficiently flexible" to cover different categories of prosecutorial misconduct claims, including knowing use of perjured testimony); see also United States v. Gonzalez-Gonzalez, 258 F.3d 16, 21-22 (1st Cir. 2001) (finding materiality standards applicable to Brady claims and Napue claims to be equivalent).[7]

_____

[6] The SJC did not discuss Napue or examine this line of cases in any depth, including only a passing citation to Giglio.  See Burgos, 965 N.E.2d at 864.  This, however, does not render the SJC's decision deficient for purposes of § 2254.  See Early, 537 U.S. at 8 (relieving state courts of the obligation to cite relevant Supreme Court decisions, so long as their reasoning and result are not inconsistent with them); see also Richter, 562 U.S. at 100 (requiring deference to state court decisions even where no reasoning at all is provided in support of a resolution of the merits of a federal constitutional claim).

[7] Burgos goes to considerable effort to challenge the materiality standard applied by the SJC here, to discredit Gonzalez-Gonzalez, and to suggest an interpretation of Bagley that would not apply the same materiality standard to Napue claims as that applicable to other Brady claims.  See Doc. No. 45 at 10-16.  His arguments, however, ignore the plain language of Bagley and the well-settled law discussed herein regarding the relevant state and federal materiality standards.

Even assuming, for present purposes, that the trial prosecutor "knowingly used" false

testimony by Rosado, Vega, or both,[8] federal habeas relief would be appropriate only if such use

_____

[8] This assumption is a generous one.  The Court has carefully reviewed the trial testimony of both men regarding the terms of their cooperation agreements and, contrary to Burgos's view, the record does not establish that the relevant testimony was "false."  Both men testified on direct that they had been told their cooperation would be taken into consideration with respect to their own charges in the case.  S.A. at Tab 6, pp.177, 229.  The record establishes that was an accurate description of the only real "term" of their agreements with the prosecutor.  Both men denied having written deals in place or that their own lawyers had negotiated definite terms.  Id. at pp.198, 257.  That, too, apparently was true.

Even Rosado's comment that "for all [he] kn[e]w [he was] doing life," id. at p.229, was true at the time he made it.  He was facing open charges that carried a potential life sentence, and there is no evidence in the record demonstrating that he had any firm agreement in place at the time of his testimony assuring him of a reduction of those charges or promising a lesser sentence.  The only deal in place was a representation by the prosecutor that Rosado's cooperation would be taken into consideration by the prosecutor – a deal which, on its face, would have allowed the prosecutor to seek a life sentence on the lead charge if he deemed Rosado's "cooperation" insufficient for any reason.  Moreover, Rosado went on to say, in response to cross-examination, that he hoped for consideration in the form of a reduction in the sentence he faced.  Id. at p.259.

The fact that both men had counsel who negotiated their "cooperation for consideration" deals, and that Rosado may have been reassured personally by the prosecutor that such a deal existed, does not render their testimony false.  They accurately described the terms pursuant to which they testified, vague though those terms were.  To the extent their denials of having specific deals in place negotiated through counsel can be considered misleading at all (in light of the fact that Rosado was present for a meeting with the prosecutor and his counsel during which the cooperation-for-consideration deal was discussed, and in light of Vega's assertion in a post-plea motion that his counsel had engaged in negotiations with the prosecutor prior to his testimony in Burgos's trial, see S.A. at 371-72, 780), it certainly was not materially so, given the limited nature of the cooperation agreements themselves and the fact that all relevant terms were disclosed to the jury by both the prosecutor and the witnesses.

Similarly, the fact that Vega ultimately received a sentence on this case that ran concurrently with one he already was serving does not render false his testimony that his cooperation would not result in assistance on his existing sentence.  Rather, it reveals that he ultimately got substantial "consideration" as to this case, as he had hoped, in exchange for his testimony against Burgos and Moure.

Finally, Burgos has not established, either through facts in the record or pertinent legal citations, that any arrangement permitting Vega to serve part of his existing sentence in a county jail rather than a state prison was a "benefit" at all, let alone one that was conferred on him by the prosecutor in exchange for his cooperation against Burgos.  See Burgos, 965 N.E.2d at 864 n.8 (finding Vega's stay in county jail was arranged for the prosecutor's benefit, to permit access to their witness throughout the various trials, and not "in consideration of Vega's agreement to testify," and further noting the arrangement "hardly seem[ed] the type of preferential treatment or benefit that would be likely to influence a witness's testimony"); see also S.A. at 742 (noting

were "material."  The SJC's conclusion that the challenged testimony was not material in the

circumstances presented here was reasonable and consistent with clearly established federal law.

The SJC assessed Burgos's claim of "misleading testimony concerning [the] nature and

terms of [the] cooperation agreement[s]" by applying the standard of review required under state

law in criminal cases where direct appeals and appeals of post-trial motions are consolidated.

Burgos, 965 N.E.2d at 862 (citing standard applicable under Mass. Gen. Laws ch. 278, § 33E).

That standard "focuses on whether the alleged errors created a substantial likelihood of a

miscarriage of justice," i.e., whether the claimed error "was likely to have influenced the jury's

conclusion."  Id. (internal quotations and citations omitted).  Contrary to the position Burgos

espouses, the § 33E standard applied by the SJC was more favorable to him than the prejudice

standard applicable here under federal law.  See Bagley, 473 U.S. at 678-82 (finding same

prejudice standard applicable to federal constitutional claims of counsel ineffectiveness and

claims of prosecutorial misconduct including use of perjured testimony); Commonwealth v.

Gomez, 881 N.E.2d 745, 751 (Mass. 2008) (describing the § 33E standard as "more favorable to

a defendant than is the constitutional standard for determining ineffective assistance of counsel"

(internal quotations and citations omitted)); see also Lynch v. Ficco, 438 F.3d 35, 48 (1st Cir.

2006) (describing state and federal standards for ineffective assistance of counsel as "functional

equivalent[s]").[9]

---

at Vega's sentencing that he had been serving his existing sentence in county jail "for safety
reasons"); id. at 909 (suggesting Vega gave a statement to police when he was incarcerated on
other charges after investigators falsely assured him he would not be charged in the Ramirez
shooting, and further told him his upcoming transfer to state prison would be delayed by two
weeks).

[9] Cf. Doc. No. 45 at 14 (admitting that the SJC has described the § 33E standard as "more
favorable to defendants than the Strickland standard").

The SJC reasonably rejected Burgos's claim and found no error that was likely to have impacted the outcome of the trial.  The record confirms that the essence of the deal was accurately described by both the prosecutor in his opening statement, S.A. at Tab 5, pp. 48-49, and the witnesses on direct examination; that no definite terms had been promised beyond the general cooperation-for-consideration agreement; that the relevant terms of the deal were disclosed to defense counsel before trial and reiterated at a sidebar during trial, id. at Tab 6, p.177; and that defense counsel explored the subject during his cross-examination of both witnesses, successfully securing testimony by Rosado that he hoped for consideration in the form of a reduced sentence as a result of his cooperation, id. at p.259.  See Burgos, 965 N.E.2d at 863-64.  Where the SJC applied a more lenient standard to Burgos's claim than federal law would require – and found that standard was not met based on facts which are borne out by the record in this case – § 2254 does not permit this Court to set aside the state court's decision and review the claim de novo.  Rather, the SJC's decision remains entitled to substantial deference, as it does not represent an "extreme malfunction" of the justice system nor an "objectively unreasonable" determination in light of the relevant federal law.[10]

In sum, notwithstanding the complex analysis set forth in Burgos's memorandum as to this issue, his petition raises a straightforward Due Process claim arising from relatively

---

[10] For reasons already stated, Burgos would fare no better under de novo review based on the facts before the Court related to this claim.  See note 7, supra.  A reasonable reading of the relevant testimony, in its entirety and in the context of the record as a whole, does not support a finding that Rosado or Vega testified untruthfully or in an otherwise misleading manner.  Id.  And even if they had, Burgos has not established the requisite prejudice.  This is so for the reasons cited by the SJC, because other witnesses corroborated key portions of Rosado's and Vega's accounts (e.g., other witnesses who saw Burgos meet with Moure and then announce that the victim had to die, and who heard Burgos brag about his role in the shooting after it occurred), and because defense counsel had ample opportunity to attack the credibility of both cooperators (and did so on a variety of grounds).

uncomplicated facts and well-settled law.  Because the state courts carefully considered and

reasonably resolved the issue in a manner consistent with Supreme Court precedent, Burgos's

first claim does not warrant habeas relief.

3.     *Ineffectiveness of Counsel*

Next, Burgos alleges his trial counsel was ineffective in three ways:  first, for presenting

Negron as a defense witness and eliciting known, damaging testimony from him; second, for

failing to object to improper cross-examination of Negron about the circumstances of his

shooting and the risks associated with testifying against a gang member; and third, for failing to

object to the trial court's factually inaccurate consciousness of guilt instruction.[11]  Doc. No. 45 at

29.  According to Burgos, the SJC unreasonably applied Strickland in finding that trial counsel

committed no professional errors amounting to constitutionally deficient performance.  Id.

The SJC rejected Burgos's ineffectiveness claims, concluding the decision to call Negron

as a witness was not manifestly unreasonable, as he was expected to contradict each of the

prosecution's witnesses who described a planning meeting at the State Street apartment on either

the day before or the day of the shooting (and his description of the conversation he heard days

before that did not assign Burgos a planning role).[12]  Burgos, 965 N.E.2d at 869-70.  It further

found no prejudice flowing from the trial court's misstatement of the evidence in the

consciousness of guilt instruction (and, implicitly, no prejudice flowing from counsel's failure to

---

[11] Although Burgos references "four unprofessional errors" by defense counsel, Doc. No. 45 at
29, he goes on to list only the three included above, id. at 29-30.  In his state court proceedings
and his initial briefing here, Burgos raised various other grounds for his counsel ineffectiveness
claim.  See, e.g., Doc. No. 2 at 8-9 (listing three additional failures by defense counsel).  The
Court will address only those errors briefed by Burgos in full here, assuming his experienced
habeas counsel has intentionally narrowed the issues in his merits brief and purposefully
abandoned those he has omitted.
[12] The SJC did not separately address Burgos's allegations regarding trial counsel's failure to
object to the prosecutor's cross-examination of Negron.

object thereto).  Id. at 867-69; see Gomez, 881 N.E.2d at 751 (describing § 33E standard as more favorable to a defendant than counsel ineffectiveness standard).  These conclusions were not contrary to, nor an unreasonable application of, clearly established federal law.

In order to establish that his counsel was constitutionally ineffective, a defendant must satisfy the two-part test set forth in Strickland.  "First, the defendant must show counsel's performance was deficient," which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  466 U.S. at 687.  "Second, the defendant must show the deficient performance prejudiced the defense." Id.  "Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.  As the Supreme Court repeatedly has emphasized, "[s]urmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371 (2010); accord Richter, 562 U.S. at 105.  This is especially so because habeas review of counsel ineffectiveness claims is subject to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  Titlow, 134 S. Ct. at 13 (quoting Pinholster, 131 S. Ct. at 1403).

Counsel's performance is measured objectively, considering only what is "reasonable[] under prevailing professional norms."  Strickland, 466 U.S. at 687-88; accord Premo v. Moore, 562 U.S. 115, 122 (2011).  Federal courts must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances.  Strickland, 466 U.S. at 689; accord Knowles v. Mirzayance, 556 U.S. 111, 124 (2009).  "It is '[r]are' that constitutionally competent representation will require 'any one technique or approach.'"  Pinholster, 131 S. Ct. at 1407 (quoting Richter, 562 U.S. at 106).  A strategic choice "made after thorough investigation of law and facts relevant to plausible options

17

[is] virtually unchallengeable." Strickland, 466 U.S. at 690. The relevant inquiry, then, is not whether counsel was "prudent or appropriate," United States v. Cronic, 466 U.S. 648, 665 n.38 (1984), but rather whether the proceedings resulting in the defendant's conviction and sentence were fair, see Strickland, 466 U.S. at 686.

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; accord Knowles, 556 U.S. at 127. It is not sufficient "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. To warrant relief, the defendant must show that counsel's errors were "so serious as to deprive [him] of . . . a trial whose result is reliable." Id. at 687.

With this "doubly deferential" standard in mind, the Court will address each of Burgos's three assertions of ineffectiveness in turn. As to the decision by trial counsel to call Negron as a defense witness, the SJC's refusal to deem counsel's performance constitutionally deficient was neither contrary to, nor an unreasonable application of, Strickland. The Commonwealth's theory at trial, based on the testimony of four separate witnesses, was that Burgos and Moure met at the State Street apartment either the night before or the day of the shooting, and that the "mission" was conceived and planned – by Burgos – during that meeting. Based on Negron's statement to defense investigators, defense counsel reasonably could have expected Negron to undermine the Commonwealth's case by disputing each of those four witnesses' accounts of the alleged planning meeting. He had told defense investigators that he was present at the State Street apartment on both relevant days, and that no such meeting had occurred. See S.A. at 367. Negron's description of a conversation (not a meeting) that he overheard a few weeks earlier (not

on either date identified by the prosecution's witnesses), in which Burgos was present while

others (not those uninvolved in the meeting described by the prosecution's witnesses) discussed

someone else's idea that Ramirez should be targeted (as opposed to Burgos concocting the plan

himself) does not change the fact that his testimony about the days leading up to the shooting

might reasonably have been thought to assist in Burgos's defense by disputing key facts

presented by the prosecution.  This is just the sort of strategic or tactical decision that is

"virtually unchallengeable" under <u>Strickland</u>.  466 U.S. at 690.

 Moreover, contrary to Burgos's vigorous characterization of Negron's testimony in his

briefing, <u>see, e.g.</u>, Doc. No. 2 at 14 (alleging defense counsel elicited "absolutely toxic

testimony" from Negron); Doc. No. 45 at 36 (accusing defense counsel of eliciting "damning

testimony" in "excruciating and irrefutable detail"), the Court's review of the trial transcript in

its entirety reveals that the testimony about which Burgos now complains was not the "debacle"

that Burgos describes, <u>id.</u> at 32.  In fact, the relevant exchange spanned only 2 pages, out of

approximately nine hundred pages, in the transcript of a 5-day trial.  S.A. at Tab 7, pp.172-74.

Furthermore, the prosecutor did not ask a single question on cross-examination about the

conversation Negron said he overheard earlier, nor did either lawyer make so much as a passing

reference to it in closing.  Finally, Negron's testimony did not fatally undermine defense

counsel's suggestion in his opening statement that the meeting described by the prosecutor never

happened at all, given the substantial differences between the nature of the exchange described

by Negron and the details surrounding the planning meeting described by the prosecution's

witnesses.[13]

---

[13] The circumstances here are a far cry from those in <u>Ouber v. Guarino</u>, 293 F.3d 19 (1st Cir.
2002), where defense counsel repeatedly promised in his opening statement that the defendant
would testify, and that his testimony would provide the basis for his acquittal, then inexplicably

Under these circumstances, the SJC reasonably concluded that trial counsel's decision to call Negron did not rise to the level of deficient performance.  Even if Burgos had offered some basis for finding <u>Strickland</u>'s performance prong were satisfied here – and he has not – the record would not support a finding that counsel's error deprived Burgos of a fair trial in any event, considering the challenged testimony in the context of the trial as a whole.[14]

The SJC did not directly address Burgos's next basis for claiming counsel's ineffectiveness – failure to object to certain portions of Negron's cross-examination.  Although the limited scope of habeas review might nonetheless require the Court to view the SJC's overall rejection of Burgos's ineffectiveness claim as one on the merits, even as to those theories not explicitly addressed, <u>see</u> <u>Richter</u>, 562 U.S. at 100 (emphasizing that a state court need not give reasons in order for its decision to constitute one "on the merits" and entitled to deference), the Court is satisfied that the record does not support a finding of deficient performance in this regard, even if considered de novo.  According to Burgos, his trial counsel unreasonably failed to object when the prosecutor questioned Negron about the timing of his own shooting and whether it was retaliation for the Ramirez shooting, and about the consequences a Los Solidos member would face for testifying against another member in a criminal trial.  Doc. No. 45 at 41-43.  The trial transcript reveals, however, that Negron's actual testimony on these subjects was confusing, at best.[15]  Notwithstanding the manner in which the prosecutor characterized Negron's testimony

---

elected not to call the defendant as a witness without offering any explanation to the jury of the change in plans.

[14] This is so whether considered individually or cumulatively with the only other error which might surmount <u>Strickland</u>'s performance prong – failure to object to the content of the jury charge, which is discussed further below.

[15] When asked about the circumstances of his shooting, Negron did not agree that someone from La Familia was responsible for shooting him, claiming not to know for certain who had done it.  S.A. at Tab 7, pp.186-88.  When pressed further by the prosecutor, he gave the following perplexing response: "I didn't know, I didn't know until I got out of the hospital.  I told, the

on these points during his closing argument, the testimony itself was not facially devastating to Burgos's case as he now suggests.  In light of the ambiguous nature of Negron's responses to the prosecutor's questioning, the Court cannot fault defense counsel for failing to object, let alone deem his silence unreasonable "under prevailing professional norms."[16]  <u>Strickland</u>, 466 U.S. at 687-88.

Regarding the trial court's closing instruction on consciousness of guilt, the SJC addressed the underlying claim itself, finding the instruction was erroneous insofar as it suggested there was evidence that Burgos had fled "after he discovered that he was about to be charged" in this case.  <u>Burgos</u>, 965 N.E.2d at 868.  "Indeed," the SJC noted, "it would be impossible for such evidence to exist, given that [Burgos] was not charged with the crime [being tried] until eighteen months later."  <u>Id.</u> at 868 n.20.  The SJC went on to conclude, however, that there was "no substantial likelihood of a miscarriage of justice" – i.e., no prejudice – flowing from the error, when the charge was considered in its entirety.  <u>Id.</u> at 868-69.  Because the standard for prejudice invoked by the SJC with respect to this underlying claim is no more demanding than the prejudice prong of the <u>Strickland</u> analysis (as discussed previously), the

---

investigator told me that [Ramirez] got shot before me – after me, after she got shot, before me, and that's what I was thinking.  The man came and shot me because they had shot her.  They told me she got shot after me."  <u>Id.</u>
    When asked what could happen to a Los Solidos member who testifies against a fellow gang member, Negron said "I don't know, maybe kill him," but then went on to say that "some people have done it and they haven't died.  No one killed them."  <u>Id.</u> at pp.193-94.  Although Negron's responses on both points appear to be speculative and/or based on hearsay (and, thus, objectionable), his testimony on these issues was internally contradictory and fairly bewildering.
[16] It seems Burgos's complaint in this regard would be more appropriately directed at the prosecutor's conduct – i.e., his exaggeration or mischaracterization of Negron's testimony on these points in closing.  <u>See, e.g.</u>, <u>Burgos</u> 965 N.E.2d at 870-71 (finding insufficient support for prosecutor's statement in closing argument that La Familia knew within an hour of the Ramirez shooting that Los Solidos was responsible and, thus, sought revenge by shooting Negron); S.A. at Tab 8, p.102.  However, he has explicitly abandoned his claims related to the prosecutor's closing argument.  Doc. No. 45 at 1.

SJC's resolution of Burgos's challenge to the content of the jury charge necessarily amounted to a rejection of his related ineffectiveness claim. This Court is bound to defer to that determination.

Assuming that defense counsel's failure to object to the content of the charge rose to the level of deficient performance for purposes of <u>Strickland</u>, the SJC reasonably reviewed the entirety of the final charge and found it "comprehensive" enough "to insulate the jury from the erroneous misstatement," then went on to emphasize the strength of the Commonwealth's case against Burgos and the relatively minor role evidence about Burgos's move to Puerto Rico played in the context of the entire trial. <u>Id.</u> at 869. The record supports the SJC's reasoning. The closing charge included an emphatic instruction regarding the jurors' sole discretion to find the facts, and an instruction that the charge itself was not evidence in the case. S.A. at Tab 8, pp.118, 125. The consciousness of guilt instruction itself contained a reminder about "the jurors' exclusive role as fact finders," <u>Burgos</u>, 965 N.E.2d at 868, and explained that flight did not always indicate feelings of guilt in general, nor did it prove guilt of the charges in the case, S.A. at Tab 8, p.134. In this context, defense counsel's failure to object was not "so serious [an error] as to deprive [Burgos] of . . . a trial whose result is reliable."[17] <u>Strickland</u>, 466 U.S. at 687.

Accordingly, none of the three grounds Burgos presses in support of his counsel ineffectiveness claim merit habeas relief.

---

[17] If the evidence regarding Burgos's alleged flight to Puerto Rico was as important as Burgos now claims, one might argue that a more serious omission by defense counsel was his failure to address the issue of consciousness of guilt at all in his closing argument. Burgos, however, has not pressed such a claim.

B.      Procedurally Defaulted Claim

1.      *Legal Standard*

A state prisoner is not entitled to habeas relief in federal court unless he has first

exhausted his available remedies in state court.  28 U.S.C. § 2254(b); see O'Sullivan v. Boerkel,

526 U.S. 838, 839 (1999); Mele v. Fitchburg Dist. Court, 850 F.2d 817, 819 (1st Cir. 1988).  To

exhaust a claim, a petitioner must "fairly present" it to the state courts, "thereby alerting [the

state courts] to the federal nature of the claim."  Baldwin v. Reese, 541 U.S. 27, 29 (2004); see

O'Sullivan, 526 U.S. at 848; Coningford, 640 F.3d at 482; Casella v. Clemons, 207 F.3d 18, 20

(1st Cir. 2000) (requiring petitioners to raise federal claims "recognizably" in state court, making

it "probable that a reasonable jurist would have been alerted to the existence of the federal

question" (internal quotations omitted)).  Failure to exhaust federal claims in state court results in

procedural default of those claims for habeas purposes if "the court to which the petitioner would

be required to present his claims in order to meet the exhaustion requirement would now find the

claims procedurally barred."  Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991).

Even where a petitioner has fairly presented his federal claims in state court, procedural

default occurs when the state court refuses to address such claims on the merits because of "a

state-law ground that 'is independent of the federal question and adequate to support the

judgment.'"  Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729); accord

Janosky v. St. Amand, 594 F.3d 39, 44 (1st Cir. 2010); see Martinez v. Ryan, 132 S. Ct. 1309,

1316 (2012) ("[A] federal court will not review the merits of claims, including constitutional

claims, that a state court declined to hear because the prisoner failed to abide by a state

procedural rule.").  The purpose of the procedural default rule is to prevent habeas petitioners

from avoiding the exhaustion doctrine by defaulting their claims in state court.  Coleman, 501

U.S. at 732; see Martinez, 132 S. Ct. at 1316 (noting such rules are "designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism").

Massachusetts law imposes "a routinely enforced, consistently applied contemporaneous objection rule." Burks v. Dubois, 55 F.3d 712, 716 (1st Cir. 1995); see Commonwealth v. Lavoie, 981 N.E.2d 192, 197 n.8 (Mass. 2013); Mass. R. Crim. P. 22. The rule is "firmly established and consistently followed," Martinez, 132 S. Ct. at 1316, and the First Circuit repeatedly has held that it constitutes "an independent and adequate state procedural ground" that bars federal habeas review, Janosky, 594 F.3d at 44. Although Massachusetts appellate courts sometimes review claims for "miscarriage of justice" despite a failure to contemporaneously object, that sort of discretionary and limited review "does not in itself indicate that the court has determined to waive" the contemporaneous objection rule and consider the underlying claim on its merits. Tart v. Massachusetts, 949 F.2d 490, 496 (1st Cir. 1991); accord Janosky, 594 F.3d at 44; Burks, 55 F.3d at 726 n.2. Federal courts will infer waiver of such a state procedural rule only if the state court makes it "reasonably clear that its reasons for affirming a conviction rest upon its view of federal law," rather than the relevant state procedural requirement. Doucette v. Vose, 842 F.2d 538, 540 (1st Cir. 1988).

A petitioner may obtain review of defaulted claims only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the[] claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; accord Martinez, 132 S. Ct. at 1316; Janosky, 594 F.3d at 44. To demonstrate cause sufficient to excuse default, a petitioner must prove "some objective factor external to the defense impeded counsel's [or petitioner's] efforts to comply with the State's

procedural rule."  Murray v. Carrier, 477 U.S. 478, 488 (1986); accord Coleman, 501 U.S. at

753.  "[I]neffective assistance of counsel, so severe that it violates the Sixth Amendment, may

constitute cause to excuse a procedural default," but only if "the petitioner exhausted his

ineffective assistance claim in state court."  Janosky, 594 F.3d at 44 (citing Murray, 477 U.S. at

488-89).

To establish "actual prejudice," a petitioner must demonstrate that the alleged errors

"worked to his actual and substantial disadvantage, infecting his entire trial with error of

constitutional dimensions."  United States v. Frady, 456 U.S. 152, 168 (1982); accord Ortiz v.

Dubois, 19 F.3d 708, 714 (1st Cir. 1994); Avila v. Clarke, 938 F. Supp. 2d 151, 171 (D. Mass.

2013).

If a petitioner seeks to establish a "fundamental miscarriage of justice" as an alternative

to showing cause and prejudice, he must demonstrate "actual innocence."  See Schlup v. Delo,

513 U.S. 298, 324 (1995); Janosky, 594 F.3d at 46.  This requires more than a summary assertion

of innocence; the petitioner must present "new reliable evidence" of his innocence.  Schlup, 513

U.S. at 324.  Moreover, he must demonstrate that the new evidence would make it more likely

than not that "no reasonable juror would find him guilty beyond a reasonable doubt."  House v.

Bell, 547 U.S. 518, 538 (2006); see Schlup, 513 U.S. at 316 (concluding that even a "concededly

meritorious constitutional violation" is not sufficient to establish a miscarriage of justice and

excuse procedural default absent new and compelling evidence of innocence).

### 2.    *Consciousness of Guilt Instruction*

Burgos's remaining claim challenges directly the trial court's jury instruction on

consciousness of guilt.  Burgos, however, failed to preserve this objection by including it among

the various objections to the closing charge he did raise before the trial court.  S.A. at Tab 8,

pp.148-51.  Thus, Burgos failed to preserve the claim for full appellate review as required under Massachusetts law.  Burks, 55 F.3d at 716.

The SJC treated the claim as waived, in light of counsel's failure to object at trial, and engaged in "miscarriage of justice" review rather than review on the merits.  Burgos, 965 N.E.2d at 867.  Burgos acknowledges his waiver of this issue – and the related procedural default thereof for federal habeas purposes – based on his failure to comply with the state contemporaneous objection rule.  Doc. No. 2 at 13.  He argues, though, that his default should be excused based on his assertion of trial counsel's ineffectiveness which, he suggests, establishes "cause" to overcome his default.

As Burgos concedes, his failure to object to this aspect of the trial court's jury instructions at the time they were given renders his federal claim procedurally defaulted.  See Janosky, 594 F.3d at 44.  The fact that the SJC reviewed the claim for miscarriage of justice does not excuse Burgos's waiver nor salvage the claims for purposes of federal habeas review.  Id. Nothing in the SJC's decision supports an inference that it disposed of the relevant claims based on "its view of federal law."  See Doucette, 842 F.2d at 540.  Therefore, unless Burgos can show cause and prejudice for his default or demonstrate actual innocence, he is not entitled to federal habeas review of the claims.  See Schlup, 513 U.S. at 324; Coleman, 501 U.S. at 750.

As discussed above, Burgos has not established a meritorious Sixth Amendment claim of counsel ineffectiveness with respect to this issue and, thus, has not established cause for his default in that manner.  Nowhere in Burgos's submissions to this Court does he cite any other "objective factor external to the defense" which caused him to waive the claims under state law. Murray, 477 U.S. at 488.  Further, as previously stated, he has not shown, and the record does not support a finding, that the alleged error in the jury instruction on consciousness of guilt

"infect[ed] his entire trial with error of constitutional dimensions."  Frady, 456 U.S. at 168.

Finally, Burgos has neither asserted he is actually innocent of the charges in this case nor

presented "new reliable evidence" of his innocence.  Schlup, 513 U.S. at 324.  Under these

circumstances, there is no basis for excusing his procedural default, and his defaulted claim is

not eligible for review by this Court.

III.   CONCLUSION

Because each of his claims fails either on its merits or due to insurmountable procedural

default, Burgos's habeas petition is DENIED and the respondent's motion to dismiss is

ALLOWED.[18]


SO ORDERED.


  /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[18] As "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," Slack v. McDaniel, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue.  The state court's evaluation of Burgos's false evidence claim was both reasonable and consistent with federal law, and the record supports its finding that no prejudice flowed from the challenged testimony (assuming it was, in fact, false).  His three counsel ineffectiveness claims fail when examined through the doubly deferential lens of federal habeas review, and his failure to object to the closing jury charge at trial renders his final claim procedurally defaulted.  For these reasons, which are more fully set forth above, Burgos is not entitled to a certificate of appealability.